**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Jimmie Buford, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 3931 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| Saleh Obaisi, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jimmie Buford, an inmate at Stateville Correctional Center, brings this action under 42 U.S.C. § 1983 against Stateville Placement Officer Karen Rabideau, Sergeant Daniel Berkley, Assistant Warden Roletta O'Brien, and Deputy Director for the Northern District of Illinois Department of Corrections David Gomez, claiming they violated his Eighth Amendment rights by acting with deliberate indifference in assigning, or allowing the assignment of Buford to a top bunk when he was allegedly incapable of climbing the top bunk due to a preexisting Achilles tendon injury to his right leg.

He also brings claims against Dr. Saleh Obaisi and Wexford Health Sources, Inc. for their deliberate indifference to his serious medical needs that arose when he fell attempting to climb the top bunk. Specifically, Buford claims Obaisi and Wexford were deliberately indifferent to his head, knee, and shoulder injuries and that their conduct resulted in continued shoulder pain, as well as numbness and tingling in his left hand and fingers, in violation of his Eighth Amendment rights.

For the following reasons, the Court grants Defendants Obaisi and Wexford's Motion for Summary Judgment. (Dkt. No. 76). The Court also grants Summary Judgment

with respect to Defendant O'Brien. (Dkt. No. 82). Summary Judgment is denied with respect to Defendants Berkley, Rabideau, and Gomez. (*Id.*)

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. Buford is an inmate at Stateville where, at all times relevant to this lawsuit, Defendant Berkley was the Sergeant, O'Brien was the Assistant Warden, and Rabideau was a Placement Officer; Gomez was the Deputy Director for the Northern District of the Illinois Department of Corrections. (*See* Dkt. No. 84, ¶¶ 1-2; Dkt. No. 92, ¶¶ 1-2). Obaisi is the Medical Director at Stateville Correctional Center and a licensed physician in Illinois. (Dkt. No. 78, ¶ 7; Dkt. No. 90, ¶ 7). Obaisi is also an employee of Wexford. (Dkt. No. 90, Add'l Facts, ¶ 35; Dkt. No. 101-1, ¶ 35).

### A. Low Bunk Permits and Cell-Transfer Procedures

Stateville medical staff issue low bunk permits to inmates on a case-by-case basis. (*See* Dkt. No. 92, Add'l Facts, ¶ 6; Dkt. No. 105, ¶ 6). Medical staff issue these low bunk permits due to medical necessity and the medical director reviews and approves each one. (*Id.*; Dkt. No. 88, Ex. F at 18). According to Defendant Berkley, medical staff retain a copy of the permit and also issue a copy to the inmate. (Dkt. No. 87, Ex. D at 17). If an inmate has a valid low bunk permit, IDOC provides the inmate a low bunk if there is one available. (Dkt. No. 84, ¶ 24; Dkt. No. 92, ¶ 24). If there is not an available bunk, the inmate has to wait until one becomes available. (*Id.*) According to Buford, if an inmate's low bunk permit is set to expire, he has to notify the health care unit to reissue the permit. (Dkt. No. 86, 88-89). If an inmate who previously did not have a low bunk permit when assigned to a cell receives one, it is the responsibility of "someone other than Ms.

Rabideau" to notify Rabideau of the permit. (Dkt. No. 84, ¶ 23; Dkt. No. 92, ¶ 23). Rabideau testified that if an inmate receives a new permit, the inmate will send her a note, the sergeant of the cellhouse will alert her, or occasionally medical will inform her office. (Dkt. No. 88, Ex. G at 22). O'Brien testified that it is not the inmate's responsibility to notify the placement office of the new permit and, instead, the placement office receives a directive from the health care unit that a new permit was issued. (Dkt. No. 88, Ex. F at 18-19).

The Offender Tracking System, a computing system used by the placement office, shows whether an inmate has a low bunk permit on file. (Dkt. No. 88, Ex. G at 11-12). However, it only shows the current status of an inmate – it does not provide the inmate's background history. (*Id*. at 11, 15). The guards do not have access to the system because they do not have computers in the cell houses, but they may request access to it. (*Id*. at 13).

Placement officers are the only officials authorized to move inmates. (*Id*. at 24). When a placement officer decides to move an inmate to a new cell, correctional officers receive a movement order containing the inmate's name, ID number, the cell he is currently occupying, and the cell to which he has been reassigned. (*Id*. at 14). Correctional officers do not have the authority to cancel a transfer. (Dkt. No. 87, Ex. D at 14, 16). If an issue arises concerning the new cell, the officer transferring the inmate may place the inmate in a holding area while he attempts to resolve the issue. (*Id*. 14-15). In such a situation, all the officer is permitted to do is call the placement department and ask where the inmate should be moved. (Dkt. No. 88, Ex. F at 25). Inmates may also refuse the assigned housing and, if they do so, they are typically taken to segregation. (Dkt. No.

87, Ex. D at 18-19). Once an inmate refuses housing, however, the officer should alert his supervisor of the issue. (*Id*. at 18).

Neither Berkley nor O'Brien ever received directives stating that inmates are not allowed to sleep on the floor. (Dkt. No. 84, ¶¶ 19, 20; Dkt. No. 92, ¶¶ 19, 20). Inmates are provided bunks, but some choose to sleep on the floor. (Dkt. No. 84, ¶¶ 18, 21; Dkt. No. 92, ¶¶ 18, 21). Gomez testified, however, that "[i]nmates don't sleep on the floor" because it is "not an acceptable practice" due to "health, safety, [and] sanitation" reasons. (Dkt. No. 92, Add'l Facts, ¶ 22; Dkt. No. 105, ¶ 22).

### B. Buford's Bunk Assignment

In August 2012, Buford sustained an Achilles tendon injury and was issued a low bunk permit. (Dkt. No. 84, ¶ 12; Dkt. No. 92, ¶ 12; Dkt. No. 92, Add'l Facts, ¶¶ 5, 9; Dkt. No. 105, ¶¶ 5, 9). This permit expired on August 22, 2013. (Dkt. No. 84, ¶ 12; Dkt. No. 92, ¶ 12). About two weeks later, on September 4, 2013, Rabideau issued an order to move Buford to a new cell. (*See* Def. Ex. C at 54). That same day, Rabideau checked the Offender Tracking System and confirmed that Buford did not have a low bunk permit. (Dkt. No. 84, ¶ 11; Dkt. No. 92, ¶ 11).

Pursuant to Rabideau's order, Berkley transferred Buford from cell F-346, a segregated cellhouse, to cell C-252, a general population cellhouse. (*See* Dkt. No. 84, ¶ 3; Dkt. No. 92, ¶ 3). The bunk beds in C-252 do not have ladders leading to the top bunk. (Dkt. No. 92, Add'l Facts, ¶ 2; Dkt. No. 105, ¶ 2). At the time of his transfer, Buford still walked with at least one crutch from his Achilles tendon injury, though his low bunk permit had expired. (*See* Dkt. No. 92, Add'l Facts, ¶ 36; Dkt. No. 105, ¶ 36). When Rabideau authorized the move, she was not aware that Buford was on crutches. (*See* Dkt.

No. 82, Ex. G at 40). Berkley verified there was no low bunk permit on file with Buford's previous cellhouse. (Dkt. No. 84, ¶ 7; Dkt. No. 92, ¶ 7).

Upon his arrival at the new cell, another inmate—David Brunner—already occupied the low bunk. (Dkt. No. 92, Add'l Facts, ¶ 8; Dkt. No. 105, ¶ 8). Buford was unable to access the top bunk because of his crutches and asked Berkley to contact Rabideau to see if he could be moved to a different cell. (Dkt. No. 92, Add'l Facts, ¶ 10; Dkt. No. 105, ¶ 10). Berkley testified that he did not have the authority to move inmates to cells to which they are not assigned, though he may place an inmate in a holding area until he is able to "figure something out" if an issue comes up during a move. (Dkt. No. 84, ¶ 31; Dkt. No. 92, ¶ 31; Dkt. No. 87, Ex. D at 14). Berkley claims he offered Buford a cell with a low bunk in Gallery 4, that Buford refused because he did not want to go up the stairs, and that he notified Rabideau of Buford's refusal; this claim, however, is disputed by the testimony of both Buford and his former cellmate. (*See* Dkt. No. 84, ¶ 6; Dkt. No. 92, ¶ 6; Dkt. No. 87, Ex. D at 32-33).

Buford remained in his assigned cell and was provided a mattress. (*See* Dkt. No. 84, ¶ 9; Dkt. No. 92, ¶ 9). Later that same day, September 4, 2014, Buford attempted to climb onto the top bunk, but his foot gave out. (Dkt. No. 92, Add'l Facts, ¶¶ 13, 14; Dkt. No. 105, ¶¶ 13, 14). He fell to the ground, hitting his head, knee, and shoulder and was taken in a wheelchair to the healthcare unit for evaluation. (Dkt. No. 92, Add'l Facts, ¶¶ 14, 15; Dkt. No. 105, ¶¶ 14, 15). Buford was then brought back to his assigned cell in a wheelchair and was left to sleep on his mattress on the floor. (Dkt. No. 92, Add'l Facts, ¶ 16; Dkt. No. 105, ¶ 16; Dkt. No. 86, at 93). The parties do not clarify who it was that wheeled Buford back to his cell.

More than two weeks after the fall, Buford received two low bunk permits in the mail that had start dates of September 5, 2013 and September 10, 2013. (Dkt. No. 84, ¶¶ 14-15; Dkt. No. 92, ¶¶ 14-15). In the meantime, Buford attempted to speak with Berkley, but Berkley did not respond. (Dkt. No. 92, Add'l Facts, ¶ 20; Dkt. No. 105, ¶ 20). On September 9, 2013, Buford claims he spoke with Assistant Warden O'Brien and asked if he could be moved to another cell so he would not have to sleep on the floor. (Dkt. No. 92, Add'l Facts, ¶ 27; Dkt. No. 105, ¶ 27). He maintains that O'Brien informed him she would contact Rabideau and have him moved to a different cell. (*Id.*) O'Brien, however, testified that she does not recall ever speaking to Buford and was unaware of any directives prohibiting inmates from sleeping on the floor. (*See* Dkt. No. 84, ¶ 20; Dkt. No. 92, ¶ 20; Dkt. No. 88, Ex. F at 29). There is no record of any conversation taking place between Buford and O'Brien, nor is there any evidence O'Brien was aware that Buford ambulated with crutches, had fallen from his bed, or suffered from Achilles tendon problems.

On September 20, 2013, Buford spoke with Rabideau about reassignment, but Rabideau informed him that she could not reassign anyone due to a lockdown. (Dkt. No. 92, Add'l Facts, ¶ 31; Dkt. No. 105, ¶ 31). Rabideau does not recall this conversation. (*Id.*) Buford also wrote a letter to Rabideau requesting reassignment because he was sleeping on the floor. (Dkt. No. 92, Add'l Facts, ¶ 33; Dkt. No. 105, ¶ 33; Dkt. No. 88, Ex. G at 33). Rabideau does not recall how she handled the request, but does remember receiving the letter. (*Id.*)

Buford also claims that on September 20, 2013, he spoke with Deputy Director Gomez while he was in a holding area after an x-ray. (Dkt. No. 92, Add'l Facts, ¶ 25;

Dkt. No. 105, ¶ 25). Buford allegedly told Gomez that he had fallen from his bunk and was currently sleeping on the floor and needed to be moved. (*Id*.) Gomez allegedly confirmed the story with Buford's cellmate and then informed Buford he would be moved. (*Id*.) Gomez testified, however, that he does not know Buford and does not recall ever speaking to him or his cellmate. (Dkt. No. 84, ¶ 28; Dkt. No. 92, ¶ 28). Gomez testified that if a housing issue, such as an inmate being assigned to an improper bunk, were brought to his attention, he could direct the warden or assistant warden, whoever is available, to ensure that that individual['s need] was appropriately addressed." (Dkt. No. 92, Add'l Facts, ¶ 24; Dkt. No. 105, ¶ 24). Ultimately, Buford slept on the mattress on his floor from September 4, 2013 until September 24, 2013. (Dkt. No. 84, ¶ 30; Dkt. No. 92, ¶ 30).

### C. Medical Treatment

During his fall attempting to climb the top bunk, Buford claims to have hit his right knee, left shoulder, and head. (Dkt. No. 78, ¶ 15; Dkt. No. 90, ¶ 15). Buford was immediately evaluated by a registered nurse ("R.N.") and was evaluated the following day by a Physician Assistant ("P.A."). (Dkt. No. 78, ¶¶ 8, 13-14; Dkt. No. 90, ¶¶ 8, 13-14). Although the R.N. observed no signs of significant intracranial trauma, redness or swelling in the knee or shoulder, the resulting treatment plan included x-rays, Motrin, and a follow-up visit. (Dkt. No. 78, ¶¶ 9, 41; Dkt. No. 90, ¶¶ 9, 41). Obaisi ordered the x-rays and signed the Motrin prescription. (Dkt. No. 78, ¶ 10; Dkt. No. 90, ¶ 10). The following day, P.A. LaTanya Williams created another treatment plan for Buford that also included ice and heat treatment, an arm sling, a low bunk and gallery permit, and a shot of Toradol (painkiller). (Dkt. No. 78, ¶¶ 16-18; Dkt. No. 90, ¶¶ 16-18).

Due to an ongoing lockdown, x-rays scheduled for September 6th, 10th, 13th, and 16th were postponed. (Dkt. No. 78, ¶ 20; Dkt. No. 90, ¶ 20). Buford eventually received x-rays on September 23, 2013. (Dkt. No. 78, ¶ 24; Dkt. No. 90, ¶ 24). The x-ray results were negative. (*Id.*) Obaisi reviewed the results of the x-rays the following day. (Dkt. No. 78, ¶ 25; Dkt. No. 90, ¶ 25).

On October 7, 2013, Buford again spoke to an R.N. about pain in his shoulder. (Dkt. No. 78, ¶ 26; Dkt. No. 90, ¶ 26; Dkt. No. 90, Add'l Facts, ¶ 22; Dkt. No. 101-1, ¶ 22). The R.N. created a treatment plan that included scheduling Buford to see the Doctor and prescribing Motrin. (*Id.*) On October 30, 2013, Obaisi saw Buford for a follow-up appointment, noted full range of motion with respect to his shoulder, and concluded that Buford no longer required the use of a shoulder sling. (Dkt. No. 78, ¶¶ 27-29; Dkt. No. 90, ¶¶ 27-29). At this visit, Obaisi also prescribed Mobic and ordered a follow-up visit for approximately one month later. (Dkt. No. 78, ¶ 29; Dkt. No. 90, ¶ 29).

At the follow-up visit on November 27, 2013, Obaisi again concluded the shoulder sprain was resolved. (Dkt. No. 78, ¶ 32; Dkt. No. 90, ¶ 32). At this visit, Buford reported "occasional tingling in his left hand" for the first time. (*Id.*) Obaisi performed range of motion testing and prescribed Bentyl. (Dkt. No. 78, ¶¶ 32-33; Dkt. No. 90, ¶¶ 32-33). Buford saw Obaisi again on June 27, 2014 and complained of pain in the left shoulder, right knee, and numbness in his fingers on his left hand. (Dkt. No. 78, ¶ 38; Dkt. No. 90, ¶ 38). At this visit, Obaisi evaluated range of motion and squeezed Buford's shoulder to watch for visible signs of pain. (Dkt. No. 78, ¶ 40; Dkt. No. 90, ¶ 40; Dkt. No. 78-3 at 68). Obaisi testified that Buford's complaints were not supported because results of the physical examination were normal. (*Id.*) Buford disputes this medical

conclusion based upon Obaisi's testimony that Obaisi believes Buford to be malingering. (Dkt. No. 78, ¶ 39; Dkt. No. 90, ¶ 39).

Buford received treatment for other, unrelated health conditions on multiple occasions during the course of these relevant months. (Dkt. No. 78, ¶¶ 21, 31; Dkt. No. 90, ¶¶ 21, 31). The parties dispute whether Buford discussed injuries from the fall during those visits. (*Id.*)

## II. STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the Court's primary function is not to "evaluate the weight of the evidence or to determine the truth of the matter," but to determine whether there is a general issue for trial. *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir. 2001). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). The party moving for summary judgment bears the initial burden of production to show that no genuine issue of material fact exists. *Outlaw,* 259 F.3d at 837. This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Upon such a showing, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56 (e).  These facts must demonstrate that the genuine issue is material and not simply a factual disagreement between the parties. *Id.* (quoting *Logan*, 96 F.3d at 978). The "nonmovant fails to

demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.*

### III. DISCUSSION

### A. Defendants O'Brien, Berkley, Rabideau, Gomez

Buford argues that Defendants O'Brien, Berkley, Rabideau, and Gomez failed to protect him from an obvious risk of harm by assigning, or allowing him to be assigned to a cell where he was forced to sleep on the floor due to his inability to climb to the top bunk. (*See* Dkt. No. 82). Although the Constitution "does not mandate comfortable prisons," the Eighth Amendment does require prison officials to provide "humane conditions of confinement" and "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials violate a prisoner's Eighth Amendment rights when their actions constitute "deliberate indifference to a substantial risk of serious harm to an inmate." *Id.* at 828.

To establish deliberate indifference, the prisoner bears the burden of satisfying both an objective and subjective component of the claim. *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). The prisoner's conditions must be "objectively, sufficiently serious" and the action or inaction must be done with a "sufficiently culpable state of mind" in which the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 834; 837-38.

"[T]o satisfy the first element, when a claim is based upon the failure to prevent harm, the plaintiff must show that the inmate was incarcerated under conditions posing a substantial risk of serious harm." *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (internal quotations omitted). This analysis asks whether prison

conditions have "exceeded the bounds of decency of a mature, civilized society." *Lunsford v. Bennet*, 17 F.3d 1574, 1579 (7th Cir. 1994). Requiring or allowing an inmate to sleep on a mattress on the floor of his cell does not necessarily constitute an objectively serious condition. *See e.g., Antonelli v. Sheahan,* 81 F.3d 1422, 1430 (7th Cir. 1996) (inmate forced to sleep on the floor due to overcrowded jail failed to state a constitutional claim); *Stephens v. Cottey*, 145 F. App'x 179, 181 (7th Cir. 2005) (failure to provide inmate with proper bed and mattress for eight days did not violate Eighth Amendment.); *Powell v. Cook County Jail*, 814 F. Supp. 757, 759 (N.D. Ill. 1993) (holding that the Constitution is indifferent as to whether the mattress is on the floor or on the bed); *but see Townsend v. Fuchs*, 522 F.3d 765, 775 (7th Cir. 2008) (finding that sleeping on "wet, moldy, and foul smelling" mattress for a period of 59 days does constitute an objectively serious condition).

An objectively serious condition does exist, however, where there is a risk an inmate will fall attempting to climb into a high bunk due to an acute medical condition. *See, e.g., Bolling v. Carter*, 819 F.3d 1035 (7th Cir. 2016) (reversing grant of summary judgment for six correctional officers where officers refused to move inmate to a low bunk despite inmate's fall attempting to reach the top bunk and his subsequent acquisition of a low-bunk permit); *Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688 (7th Cir. 2013) (reversing grant of summary judgment for nurse where nurse left inmate suffering from back pain in cell where he was assigned to top bunk, there was no ladder leading to the top bunk, and plaintiff claimed the nurse knew he could not climb to the top bunk). In this case, there was an excessive risk to Buford's health or safety by assigning, placing, and leaving him to a ladderless top bunk when he suffered from

ongoing Achilles tendon pain; ambulated with crutches; informed officers he could not access the top bunk; was consistently provided a low-bunk permit by the medical unit save a roughly two-week period right around the time of his transfer; and fell attempting to access the top bunk within hours of assignment to it. *See id*. The issue here is whether these Defendants knew of this risk and deliberately disregarded it.

The record does not support an inference that Defendant O'Brien knew of the substantial risk of serious harm facing Buford. Buford claims only that he spoke with O'Brien on September 9, 2013 and asked if he could be moved to another cell so he would not have to sleep on the floor. O'Brien does not recall this alleged conversation, but—even assuming this conversation took place—there is no evidence O'Brien knew anything other than that Buford was sleeping on the floor and wanted to be moved. There is no evidence she knew he was on crutches, ever saw him walk using crutches, knew he had fallen attempting to climb the top bunk, or knew that he suffered from Achilles tendon problems. As already mentioned, an inmate sleeping on the floor is not necessarily an objectively serious condition and O'Brien testified she was unaware of any directive prohibiting inmates from sleeping on the floor. To satisfy the subjective element of a deliberate indifference claim, Buford must demonstrate that "the communication, in its content, and manner of transmission, gave the prison official sufficient notice to alert him or her to an 'excessive risk to inmate health and safety.'" *Arnett v. Webster*, 658 F.3d 742, 755-56 (7th Cir. 2011) (quoting *Farmer*, 511 U.S. at 837). There are simply insufficient facts from which to infer that O'Brien acted with deliberate indifference toward a risk she did not know existed. Summary judgment is therefore granted with respect to Defendant O'Brien.

Summary judgment is denied, however, with respect to Defendants Berkley, Rabideau, and Gomez. Defendant Berkley was responsible for transferring Buford to his new cell where he was assigned the top bunk. Berkley testified that he had seen other inmates with crutches access top bunks and he relied on the lack of a low bunk permit in leaving Buford in his assigned cell. *See, e.g., Allen v. Frank,* 246 F. App'x 388, 391 (7th Cir. 2007) ("Non-medical officials cannot be held liable for reasonably relying on the medical judgment of professions"). However, this is not a case where Berkley was merely responsible for following orders, relying on the medical unit's provision of low bunk permits, and transferring Buford. The record contains facts suggesting Berkley may have had alternative means for accommodating the risk to Buford, the failure of which may constitute deliberate indifference.

First, the parties dispute whether Berkley notified Rabideau about the issues that arose during the transfer, including Buford's request for a low bunk due to his ongoing Achilles tendon pain and inability to climb the bunk with crutches. O'Brien testified that the only thing an officer like Berkley can do in such a situation is alert the placement office, but—even then—there is a disputed question of fact as to whether Berkley made such contact with the placement officer and his failure to do so may have been unreasonable under the circumstances. *Compare Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("Even if a defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.").

Second, Berkley testified inconsistently about his authority with respect to cell assignments. Though Berkley testified that he has no authority to change an inmate's cell

assignment, he also stated that he offered Buford a low bunk in another cell. The parties dispute whether Berkley actually made such an offer, but—regardless—this testimony suggests that Berkley had authority to move inmates to other cells. Berkley also testified that he had the authority to place an inmate in a holding area until he "figured something out" if an issue arose during a move—another potential alternative not availed of in this case. Buford may not have possessed a low bunk permit at the time he was transferred, but that does not necessarily absolve the transferring placement officer responsible for placing him in his cell from liability under the Eighth Amendment. *See, e.g., Bolling*, 819 F.3d 1035; *Withers*, 710 F.3d 688. Summary judgment is denied with respect to Defendant Berkley.

Issues of fact similarly remain with respect to whether and when Defendants Rabideau and Gomez were made aware of Buford's need for a low bunk and whether their failure or delay in responding to that need demonstrated deliberate indifference. Subsequent to Buford's fall attempting to access his top bunk on September 4, 2013, Buford was evaluated by the medical unit and returned to his same cell with a mattress on the floor. Still, he was not moved. Over the next twenty days, Buford made repeated attempts to be transferred to a cell with a low bunk. He attempted communication with Berkley, O'Brien, Gomez, and Rabideau about reassignment.

Preliminarily, there is—as already mentioned—a dispute as to whether Berkley first alerted Rabideau to the risk facing Buford when Buford was moved on September 4, 2013. There are also disputes regarding all subsequent communications between Buford, Gomez, and Rabideau. Buford testified that he spoke with Gomez around September 20, 2013 while he was in a holding area returning to his cell from an x-ray and explained to

Gomez that he had fallen from his bunk and was currently sleeping on the floor and needed to be moved. Buford's cellmate testified that Gomez spoke with him to verify Buford's story and told Buford he would be moved. (Dkt. No. 92, ¶ 25; Dkt. No. 105, ¶ 25). Gomez does not recall speaking with Buford or Buford's cellmate, but he does not deny the conversations may have occurred.

Rabideau, meanwhile, did not know Buford was on crutches at the time she initially assigned him to his cell, but she does recall receiving a letter from him requesting to be moved to another cell. She did not recall how she handled the request, but it is undisputed that Buford was not moved to another cell until September 24, 2013. This is despite the fact that Buford fell twenty days earlier and received two low-bunk permits with start dates of September 5, 2013 and September 10, 2013. The record is wholly unhelpful in describing what, if any policies existed to notify Defendants of these new permits once they were approved by the medical unit and Buford did not receive a hard copy of the permits until about two weeks after his fall. Regardless, the record demonstrates a dispute as to whether Rabideau and Gomez—both of whom had the authority to affect a move on Buford's behalf—had knowledge of Buford's living conditions and the substantial risk of serious harm facing him.

There is no evidence or suggestion that the prison was overcrowded or that there was no low bunk available for Buford and the parties dispute whether Berkley offered Buford an alternative cell. *Compare, e.g., Shegog v. Rivers*, No. 14 C 1722, 2015 WL 8536733 (N.D. Ill. Dec. 11, 2015) (granting summary judgment where defendant did not have a low bunk to provide inmate because they were all full). There is similarly no evidence suggesting Buford was voluntarily sleeping on the floor; on the contrary, he

appears to have been actively seeking accommodation. *Compare, e.g., Williams v. Ramos*, 71 F.3d 1246 (7th Cir. 1995) (affirming grant of summary judgment where inmate with low bunk permit was given choice of top bunk in protective custody or low bunk in segregation); *Obama v. Burl*, 477 F. App'x 409 (8th Cir. 2012) (affirming dismissal of Eighth Amendment claim where inmate voluntarily chose to sleep on floor).

It may be that Buford did not suffer an injury from sleeping on the floor for twenty days or that he was only on the floor for a mere four days after Rabideau and Gomez first learned of his conditions, *see, e.g., Lindsey v. Shaffer*, 411 F. App'x 466 (3rd Cir. 2011) (affirming grant of summary judgment where inmate slept on mattress on floor for 6-7 weeks because there was no injury from these sleeping conditions), but Defendants have failed to develop such an argument and it is deemed waived. *See Perry v. Sullivan*, 207 F.3d 379, 383 (7th Cir. 2000) (single-sentence argument unsupported by citation to authority deemed waived). The Court may not weigh the evidence and may not make credibility determinations at this stage. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). Nor may the Court make a determination as to which party's version of the facts is more likely to be true. *Id*. At this stage, drawing all inferences in favor of Buford, the Court denies summary judgment with respect to Defendants Rabideau and Gomez.

### B. Defendants Obaisi and Wexford

Summary judgment is granted, however, with respect to Defendants Obaisi and Wexford. As a convicted prisoner, Buford is entitled to humane conditions of confinement, including reasonable measures to guarantee his safety through provision of medical care. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010); *Farmer v. Brennan*,

511 U.S. 825, 832 (1994). However, he is not entitled to demand specific treatment or receive the best possible care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, to establish a constitutional violation, Buford must show Obaisi and Wexford acted with "deliberate indifference to serious medical needs." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate indifference requires both objective substantial medical risk and subjective knowledge of and disregard for that risk. *Farmer*, 511 U.S. at 834, 837. "[F]ailure to alleviate a significant risk that [an official] should have perceived but did not" is insufficient. *Id.* at 838.

Defendants assume for purposes of their argument on summary judgment that Buford was experiencing some serious medical need, *see* Dkt. No. 77 at 3, arguing instead that Obaisi and Wexford did not act with deliberate indifference to that need. To show conscious disregard of significant risk, Buford need not establish that he was literally ignored. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). A doctor can be deliberately indifferent by choosing easier treatment that the doctor knows to be ineffective. *Id.* However, it is not enough that Buford merely disagrees with the doctor's judgment. *Id.* Even instances of negligence or medical malpractice may not constitute deliberate indifference unless "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (internal quotations omitted). Decisions made by professionals are presumed valid. *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). Treatment decisions, based on the totality of care, are entitled to deference "unless no

minimally competent professional would have so responded under those circumstances." *Elyea*, 631 F.3d at 857 (internal quotation omitted).

Buford claims Defendants were deliberately indifferent for failing to grant his request for magnetic resonance imaging ("MRI") to diagnose pain in the five months after his fall. (Dkt. No. 78-1 at ¶ 31). Specifically, he seeks injunctive relief of access to an MRI of his left shoulder at St. Joseph of UIC. (Dkt. No. 78-1 at ¶ 11). However, Buford is not constitutionally entitled to this specific course of treatment. *See Forbes*, 112 F.3d at 267. He is entitled to adequate medical care based on need, as determined by the opinion of treating medical professionals. *Johnson*, 433 F.3d at 1013–14.

Obaisi used his professional judgment to diagnose and treat the injuries Buford sustained from falling from his bunk. The totality of the care Buford received demonstrates Obaisi exercised his professional judgment to provide adequate medical care. Buford was evaluated immediately after his fall on September 4, 2013; had a follow-up visit with a P.A. the next day; received x-rays on September 23, 2013 that were reviewed by Obaisi the following day; consulted with an R.N. on October 7, 2013; and had follow-up visits with Obaisi on October 30, 2013, November 27, 2013, June 27, 2014. (Dkt. No. 78, ¶¶ 8–9, 13, 15, 19, 24–28, 32, 38; Dkt. No. 90, ¶¶ 8–9, 13, 15, 19, 24–28, 32, 38). The level of access Buford had to medical professionals for evaluation of his injuries is inconsistent with allegations that those professionals were deliberately indifferent to his injuries. *See Norfleet v. Webster*, 439 F.3d 392, 396–97 (7th Cir. 2006); *Pyles v. Fahim*, 771 F.3d 403, 406 (7th Cir. 2014).

In addition to the sheer number of visits, Buford also received consistent treatment. Almost immediately after his fall, Buford received Motrin, a painkiller shot of

Toradol, heat and ice treatment, an arm sling, and a Low Bunk, Low Gallery permit. (Dkt. No. 78, ¶¶ 9-10, 16, 17, 19; Dkt. No. 90, ¶¶ 9-10, 16, 17, 19). Based on negative x-ray results and a physical evaluation showing normal range of motion, Obaisi determined Buford no longer needed a shoulder sling as of October 30, 2013. (Dkt. No. 78-3 at 47). Even though Obaisi testified that he believed Buford was exaggerating his injury, he prescribed an anti-inflammatory medication that had the potential to reduce pain he might have had in his shoulder. (*Id.* at 47-48). One month later, on November 27, 2013, Buford reported no shoulder pain and only occasional tingling in hand. (Dkt. No. 78, ¶ 32; Dkt. No. 90, ¶ 32). Obaisi prescribed Bentyl for two weeks. (*Id.*) However, Obaisi testified that he was not concerned about occasional tingling as this is a common problem that does not warrant "extensive workup" (Dkt. No. 78-3 at 50). On June 27, 2014, Obaisi noted Buford's subjective complaints of pain in shoulder, knee, and numbness in hand along with several other unrelated complaints, but found no objective evidence to support these claims based on physical examination within normal limits, arm movement with normal range of motion, prior negative x-rays, and no visible pain response to squeezing the shoulder. (*Id.* at 68-70). As these findings and orders were made by professionals, including Obaisi, the Court must presume they are valid unless Buford can show that no other competent professional would have treated the injuries in a similar way. *See Elyea*, 631 F.3d at 857. Buford makes no such showing.

Obaisi testified that if someone presents with persistent rather than occasional tingling over the course of many months, he would perform tests to diagnose the problem. (*See* Dkt. No. 78-3 at 52). However, based on his professional evaluation of Buford, Obaisi does not subjectively believe there is any need for further evaluation or

treatment for a serious problem stemming from a medical record containing only two references to occasional tingling or numbness. (*Id.* at 68-71). Obaisi cannot consciously disregard a risk he does not believe exists, and therefore lacks the subjective element required to show deliberate indifference. *See Farmer*, 511 U.S. at 837. Buford suggests that the prescriptions Obaisi wrote indicated he believed Buford's subjective reports; however, treatment with pain medication after medical evaluation without finding of abnormality is not evidence of deliberate indifference. *See Pyles*, 771 F.3d at 406. This Court need not decide whether Obaisi's reliance on physical examination, observation of visible reaction to touch to rule out nerve conditions is appropriate, negligent, or even an example of medical malpractice as none of these contain the requisite subjective understanding necessary under a deliberate indifference standard. *See Estelle*, 429 U.S. at 293 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice and, as such the proper forum is the state court . . . ."); *compare Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999) (a doctor may be deliberately indifferent by disregarding prisoner complaints without any form of evaluation, and subsequently upon subjectively recognizing a nerve condition, delaying specialist care for over a half a year). The Court grants Defendants' Motion for Summary Judgment with respect to Obaisi.

Wexford Health Sources, Inc. is also entitled to summary judgment as Buford failed to show how a reasonable jury could find that it disregarded his constitutional right to adequate medical care. Even if the company could be held to answer for the deliberate indifference of an employee, *see Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 ("It is well-established that there is no respondeat superior liability under § 1983"), Wexford's

employee was not deliberately indifferent to Buford's significant medical needs. *See Pyles*, 771 F.3d at 412. An entity may violate § 1983 through an official policy or established custom of constitutional deprivation, *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978); but, Buford has failed to provide any evidence of an expressed policy, widespread custom, or action by a policy-making authority. *Compare Dixon v. County of Cook*, 819 F.3d 343, 348 (2016). He merely alleges a few instances of questionable treatment by Obaisi for several unrelated injuries without specifying any overarching policy unifying those hypothetical bad acts. (*See* Dkt. No. 89 at 14).

Buford suggests that Obaisi has a pattern and practice of deliberately postponing treatment, identifying it as a "de facto" policy for cost-cutting measures; however, such conclusion is belied by the record. Obaisi was aware that x-rays are more reasonably priced than MRIs, but this knowledge does not establish a policy of relying on that information regardless of the circumstances in a particular case. On the contrary, Obaisi testified that cost is not a factor in his decision making about what care to provide to patients. (Pl. Add'l Facts ¶ 32; Dkt. No. 78, Resp. ¶ 32). And, even if it were, "[t]he cost of treatment alternatives is a factor in determining what constitutes adequate, minimum level of care…" *Johnson* 433 F.3d at 1013 (citations omitted). Buford's claims against Wexford are unsupported by the record before the Court and Wexford's motion for summary judgment is therefore granted.

## **CONCLUSION**

For the reasons stated above, the Court grants Defendants Obaisi and Wexford's Motion for Summary Judgment. (Dkt. No. 76). The Court also grants Summary Judgment with respect to Defendant O'Brien. (Dkt. No. 82). Summary Judgment is denied with respect to Defendants Berkley, Rabideau, and Gomez. (*Id.*)

Date: 8/11/2016

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois